**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JOSE GERALDO,<br><br>    Defendant. | Civil Action No. 02-2427<br>Criminal No. 98-391 (CKK) |

FILED
DEC - 6 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MEMORANDUM OPINION**
(December 6, 2007)

Currently before the Court is Defendant Jose Geraldo's [228] Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("Def.'s Mot."). Defendant was convicted of seven drug-related charges on May 25, 2000. Defendant appealed his conviction to the Court of Appeals for the D.C. Circuit claiming, *inter alia*, that his trial counsel was constitutionally ineffective because she did not assert Defendant's privacy interest in an apartment building searched by the FBI where Defendant sold drugs to FBI informants. The D.C. Circuit affirmed Defendant's conviction on November 27, 2001, and Defendant began the collateral attack on his conviction on November 27, 2002.

Defendant's Motion seeks relief from his sentence because, according to Defendant, he received constitutionally ineffective assistance of his counsel, Ms. Asiner. On January 30, 2005, Defendant filed a "Traverse," which added additional claims based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *United States v. Booker*, 543 U.S. 220 (2005). After a careful and searching review of the Parties' submissions and the attachments thereto, applicable statutory

authority, case law, and the record as a whole, the Court shall DENY Defendant's Motion and the additional claims raised in Defendant's Traverse for the reasons that follow.

## I. BACKGROUND

Defendant's drug-related charges originate from three transactions where Defendant sold cocaine or cocaine base to FBI informants.[1] *See United States v. Geraldo*, 271 F.3d 1112, 1115 (D.C. Cir. 2001) (providing background related to Defendant's case and affirming his conviction). FBI agents obtained a search warrant for Defendant's residence and for the apartment building where these transactions occurred. *See* Gov't Opp'n at 2. During the search of Defendant's residence, FBI agents found "hidden under a mattress in [Defendant's] bedroom a razorblade with cocaine residue and a key that fit the padlock on a closet at [the apartment building]. The agents found in that closet 242 grams of powder cocaine. Elsewhere . . . the agents found 69.3 grams of crack cocaine, four kilogram wrappers used to package cocaine, and a pot recently used to cook crack cocaine." *Id.*

Defendant pleaded not guilty to all charges. *See* Def.'s Mot. at 7. After rejecting a plea offer by the Government for 108 months incarceration pursuant to Fed. R. Crim. P. 11(c)(1)(c), Defendant was tried before a jury in a twelve-day trial. *See* Gov't Opp. at 2, 14. The jury

---

[1] Defendant was indicted on the following charges: Count (1) Conspiracy to Distribute 50 Grams or More of Cocaine Base, 21 U.S.C. § 846; Count (2) Unlawful Distribution of 50 Grams or More of Cocaine Base, 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(iii); Count (3) Unlawful Distribution of 5 Grams or More of Cocaine Base, 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(iii); Count (4) Unlawful Use of a Communication Facility, 21 U.S.C. § 843(b); Count (5) Unlawful Distribution of 50 Grams or More of Cocaine Base, 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(iii); Count (6) Unlawful Maintenance of Premises to Manufacture, Distribute, Store and Use a Controlled Substance, 21 U.S.C. § 856(a)(2); Count (7) Unlawful Possession with Intent to Distribute Cocaine Base, 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii); and Count (8) Unlawful Possession with Intent to Distribute Cocaine, 21 U.S.C. § 841(a)(1) and (b)(1)(C). Def.'s Mot. at 8–9.

acquitted Defendant on Count I (conspiracy to distribute 50 grams or more of cocaine base), and found Defendant guilty on each of the seven other counts. *Id.* at 2. The Court sentenced Defendant to 160 months imprisonment followed by five years of supervised release. *Id.* Defendant filed a timely appeal arguing that the FBI's search of his residence violated the federal knock and announce statute, 18 U.S.C. 3109, and exceeded the scope of the search warrant. *See Geraldo*, 271 F.3d at 1114. Defendant also argued that his attorney was deficient in not challenging the admissibility of the evidence obtained in a search of the apartment building where he had sold drugs to FBI informants. *Id.* The D.C. Circuit affirmed Defendant's conviction on November 27, 2001. *Id.* at 1119.

On November 27, 2002, Defendant filed the instant Motion, which he amended on June 18, 2004. Although the Motion lists three "claims," Defendant actually is asserting the same claim – ineffective assistance of counsel – covering three "phases" of his counsel's representation (plea, pre-trial, and sentencing). The Government filed an Opposition on January 7, 2005. Defendant filed his Traverse on January 30, 2005, which the government opposed on March 30, 2005. Defendant filed a Reply on March 30, 2005.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner in custody sentenced in a federal court may move the sentencing court to vacate, set aside, or correct the sentence if the prisoner believes his sentence was imposed "in violation of the Constitution or laws of the United States . . . or that the sentence was in excess of the maximum authorized by law . . . ." 28 U.S.C. § 2255 (1996). A district court judge need not conduct an evidentiary hearing before denying a §2255 motion when "the motion and files and records of the case conclusively show that the prisoner is entitled to no

relief." *Id.*; *United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir. 1996). As the rules governing §2255 proceedings provide, "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal . . . ." Rules Governing § 2255 Proceedings, Rule 4, 28 U.S.C. § 2255 (2005). Accordingly, a § 2255 Defendant is not automatically entitled to an evidentiary hearing, and should not receive one if his allegations are "vague, conclusory, or palpably incredible" rather than "detailed and specific." *Machibroda v. United States*, 368 U.S. 487, 495 (1962); *see also United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 915 (1992) ("Only where the § 2255 motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection' must a hearing be held.") (quoting *Machibroda*, 368 U.S. at 495); *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993) ("[E]videntiary hearings are the exception, not the rule."). This is so even if the files and records of the case do not clearly rebut the allegations of the claim. *Id.* The party seeking an evidentiary hearing in a § 2255 proceeding therefore carries a fairly high burden of demonstrating a need for such a hearing, and the decision whether to grant one is "committed to the district court's discretion." *Pollard*, 959 F.2d at 1031.

### III. DISCUSSION

Defendant's Motion claims that Defendant was subject to constitutionally ineffective assistance of counsel, and Defendant's Traverse claims that Defendant received a constitutionally defective sentence pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *United States v. Booker*, 543 U.S. 220 (2005). The Court will address each of these claims in turn.

4

    *A.*   *Ineffective Assistance of Counsel*

Under the test for ineffective assistance of counsel, as set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a successful claimant must meet two requirements. First, the party must show that his attorney's deficient representation fell below "an objective standard of reasonableness." *Id.* The attorney must have made "errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* Legal advice is adequate unless counsel is not "a reasonably competent attorney" and the advice is not "within the range of competence demanded of attorneys in criminal cases." *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)).

A court conducting an inquiry should measure attorney performance under "prevailing professional norms," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 688-90. As such, the Defendant must overcome a strong presumption that counsel rendered effective assistance and "that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Askew*, 88 F.3d 1065, 1070 (D.C. Cir. 1996) (quoting *Strickland*, 466 U.S. at 689-90).

Notwithstanding the burden to establish professionally defective assistance, the Defendant must also satisfy the second prong of the *Strickland* test – i.e., prejudice sufficient to create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. This requires the Defendant to affirmatively show that counsel's mistakes were so serious "as to deprive the defendant of a fair trial." *Id.* at 687. A showing of sufficient prejudice requires more than a mere allegation "that the errors had some conceivable effect on the outcome of the proceedings." *Id.* at 693. Rather, a

defendant must demonstrate that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

Lastly, a court deciding an ineffective assistance of counsel claim does not need to address both the deficient performance and prejudice components of the inquiry if an insufficient showing on one prong is evidenced. Id. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Accordingly, Defendant must show that his trial counsel made professional errors sufficient to affect the outcome at trial.

    1.    Claims Related to "Plea Phase"

Defendant's first set of arguments relates to his counsel's performance during the plea process, which Defendant argues was so deficient as to interfere with his Sixth Amendment rights. Def.'s Mot. at 10. Although the specifics of Defendant's argument are not entirely clear, it appears Defendant is arguing that he would have accepted the Government's plea offer had his counsel provided effective assistance. This argument is belied by the record.

The Government made an initial plea offer to Defendant and Mr. Ortiz, his co-Defendant, by letter on April 12, 2000. See Gov't Opp'n Ex. A at 1-2 (Letter from Arvind K. Lal to Ms. Asiner). Under the terms of this offer, the Government would drop six of the eight counts against Defendant, and Defendant would plead guilty to two counts of distribution of crack cocaine – Count 3 (which had a five-year mandatory minimum sentence) and Count 5 (which had a ten-year mandatory minimum sentence). Id. The Government took the position that Defendant was ineligible for the safety valve[2] under the Federal Sentencing Guidelines, but agreed to

---

[2] U.S.S.G. § 5C1.2 and U.S.S.G. § 2D1.1(b) allow a court to impose a sentence without regard to any statutory minimum sentence if the court finds that the defendant meets certain

6

support a three-point reduction for acceptance of responsibility. *Id.* Based on the foregoing, the Government "would agree to a sentence of 108 months." *Id.* The plea offer was also "wired," meaning that both Defendant and Mr. Ortiz would have to accept the Government's plea offers or both offers would be withdrawn.[3] Defendant's counsel responded by letter dated April 15, 2000, arguing that the Government's plea offer was not favorable enough and urging the Government to improve its offer. *See* Gov't Opp'n Ex. B at 1 (Letter from Ms. Aisner to Mr. Arvind Lal).

The Parties continued their plea discussions at a hearing held before this Court on May 3, 2000. The Government again agreed to dismiss six of the eight counts against Defendant in exchange for his pleading guilty to two counts of distribution, and continued to offer a sentence of 108 months imprisonment. *See* Status Conf. Tr. at 25-26 (D.D.C. May 3, 2000) (hereinafter "Tr. May 3, 2000").[4] Unlike the plea offer in its letter, however, the Government agreed to "not oppose the application of the safety valve to [Defendant] and, therefore, that would give the court the authority to depart from the mandatory minimums." *Id.* at 6. The Government also agreed to support a reduction of 3 points for Defendant's acceptance of responsibility. *Id.* at 26.

---

criteria. These provisions are often referred to as the "safety valve."

[3] The Government's letter setting forth this plea offer expressly rejected a proposal put forth by Defendant's counsel, who proposed to have Defendant plead "to a section 371 conspiracy." *See* Gov't Opp'n Ex. A at 2 ("That proposed disposition is unacceptable to the Government.").

[4] The Government did not rely on the May 3, 2000 transcript for purposes of its Opposition. Although it did indicate that it had ordered the transcript and would consider later supplementing its pleading, it did not do so. Nevertheless, the Court has relied on the May 3, 2000 transcript, which was a part of the record and was filed on the docket in this case. The Court has attached to this Opinion a copy of the full colloquy of the plea offer from the May 3, 2000 transcript.

7

The Court reviewed on the record the details of the plea offer and clarified how the Government calculated it. *Id.* at 25-29. The Court then proceeded to summarize the plea offer to ensure that Defendant understood it:

> THE COURT: So let me go through this again in terms of understanding it. Because originally, Mr. Geraldo, they were not willing to agree that the safety valve applied to you, as you noticed in the letter, which would have left you with the mandatory minimums, which is the thing I pointed out to them yesterday, is that unless they had some way of getting you out of the mandatory minimums I legally would not be able to agree with a sentence that involved something other than a mandatory minimum. So I let them go and discuss what they wanted to do.
>
> They've come back this morning and said, 'Okay. We will not argue that the safety valve doesn't apply to Mr. Geraldo.'
>
> * * *
>
> They are still giving you the reduction for acceptance of responsibility. And whether or not you would get the additional two points really probably isn't particularly relevant, because the sentence that they want you to accept puts you in the 87 to 108 [month range], which is at a [level] 29.
>
> * * *
>
> Does it make sense? I'm not saying you accept it. Do you understand what is involved here in terms of the calculation? If you don't, go ahead and ask.
>
> MS. ASINER: He understands.

*Id.* at 29-31.

The Court then proceeded to discuss the some of the advantages and disadvantages of the Government's plea offer with Defendant, to ensure he understood how it would operate:

> THE COURT: . . . the other two things that you should be aware of, Mr. Geraldo, is that what you would be agreeing to is 9 years maximum, which would be for both counts. In other words, you would be pleading guilty to two counts, but the sentence for the two counts is 9 years, period.
>
> * * *

Now, the advantage to you involved here is [the Government] would drop six counts. They would not argue that the safety valve didn't apply to you, which would mean that the mandatory minimums would not apply.

\* \* \*

In terms of mandatory minimums. Now, as I said, I don't know whether the safety valve would apply to you or not if you went to trial. I don't know enough about the case. So I'm not going to tell you one way or the other.

Obviously, if the government and I agree that it does apply as part of the plea, you don't have to worry about it. I don't know, if you went to trial, whether at the end I would still decide that the safety valve applies and, therefore, you would be out of the mandatory minimum; but if I did decide that it [didn't apply], was convinced by the government and maybe the presentence report writer, then what you're left with is 45 years of mandatory minimums, assuming I sentence you one right after the other.

Again, I'm not saying I'm doing that. I'm just telling you [about] the worst thing you would face, plus some additional years in here because there's two counts that don't involve mandatory minimums.

So all I'm trying to do is set out what your options are. You know the case. You have to decide. It's your life. You're the one spending the time, not me. So you will have to decide exactly what you want to do.

Does anybody have any questions so that we can sort of close this?

\* \* \*

All I do is make sure you understand the plea as I understand it, and I've gone into some detail because this is a little unusual to the extent that the court has to agree to the sentence and I don't usually have to agree to what the sentence is before there's a final acceptance of the plea. And that's unusual. So that's why I wanted you to understand exactly what's involved with it. Okay?

All right. Then let's move along here.

*Id.* at 33-35.

After the Court's review of the plea agreement, the Court allowed Defendant additional time to confer with his counsel and to think about whether he wanted to accept the plea. *Id.* at

34-35. At the Court's May 5, 2000 status hearing with the Parties, Defendant rejected the plea offer:

> THE COURT: Are your clients in a position at this point to make, through you, to indicate whether they are interested in the plea or not?
>
> * * *
>
> MS. ASINER: . . . On behalf of Mr. Geraldo, he does not want [the plea], and if I'm wrong, he can correct the record now, your Honor.
>
> THE COURT: I don't see him correcting the record, so I'm assuming that he is not interested in the plea offer either. Is that correct, Mr. Geraldo? Mr. Geraldo, is that correct?
>
> THE INTERPRETER: No
>
> MR. LAL:[5] It's not correct?
>
> THE COURT: It's not correct or you don't want to accept the plea offer?
>
> THE INTERPRETER: I do not accept it.

Gov't Opp'n Ex. B at 6-7 (Tr. of Sentencing (D.D.C., Sept. 18, 2000)) (hereinafter "Sent. Tr.").

Against this record, Defendant sets forth numerous arguments that, according to Defendant, demonstrate that his counsel provided ineffective assistance under *Strickland*. This Court finds that Defendant's arguments are "vague, conclusory, [and] palpably incredible." *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992). For example, Defendant argues that "counsel could have but did not explore a favorable plea agreement with the government. . . ." Def.'s Mot. at 11. That argument is directly controverted by the record. The Government sent a plea offer to Defendant's counsel by letter dated April 14, 2000, wherein the Government acknowledges and rejects a proposed plea advanced by Defendant's counsel. *See* Gov't Opp'n

---

[5] Mr. Lal was counsel for the Government.

Ex. A at 2 ("On April 13, 2000, I received a voice mail from Ms. Asiner in which she proposed that Mr. Geraldo plead to a section 371 conspiracy. That proposed disposition is unacceptable to the Government."). Defendant's counsel then sent a letter to the Government dated April 15, 2000, arguing that the Government should improve its offer, *id.* Ex. B at 1-2, and the Government subsequently did so, *see* Tr. May 3, 2000 at 6 (agreeing to application of the safety valve and elimination of the mandatory minimum sentences for Defendant's charges). Ultimately, Defendant himself rejected the Government's plea offer on the record. *See* Sent. Tr. at 7 ("I do not accept it").

Defendant argues that even if his counsel sought to inform Defendant of the relevant facts surrounding the Government's plea offer, she did so in English, and Defendant does not "read, write, speak or understand English." Def.'s Mot. at 15. This language gap, according to Defendant, "distorted his perception of the risk factors associated with his plea." *Id.* This claim is meritless because Defendant was provided with an interpreter for all hearings before the Court, including the May 3, 2000 hearing where the Court explained in great detail the Government's plea offer, and the May 5, 2000 hearing where Defendant, through an interpreter, rejected the offer.[6] Moreover, Defendant does not identify what "relevant facts" he was missing that "distorted his perception of the risk factors." Such conclusory arguments may be summarily dismissed by the Court. *See United States v. Morrison*, 98 F.3d 619, 625-26 (D.C. Cir. 1996) ("[w]e have also held that a summary denial of a § 2255 motion is appropriate when the ineffective assistance claim is speculative"); *Pollard*, 959 F.2d at 1031 ("[o]nly where the § 2255

---

[6] It also appears from the record and the Court's recollection that Defendant's counsel could speak at least some Spanish, *see* Gov't Opp'n at 15-16 n.3, and Defendant himself appears to have been able to understand at least some English. *See* Gov't Opp'n Ex. L at 1 (letter dated February 14, 2002, from Defendant to attorney Stephen C. Leckar, hand-written in English).

motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection' must a hearing be held"). *See also Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991) ("greater particularity" and "some substantiation" in addition to an affidavit of the defendant is necessary "to warrant a further investment of judicial resources" on an ineffective assistance of counsel claim).

Defendant argues that his counsel "failed to investigate the facts and law surrounding his case," Def.'s Mot. at 13, but he fails to show precisely what his counsel should have done differently, and fails to refute the record in this case that shows Counsel's substantial efforts on behalf of her client. *See United States v. Parman*, 461 F.2d 1203, 1205 (D.C. Cir. 1971) ("a court cannot engage in vague speculations about the kind of 'investigation' defense counsel might have made").[7] For example, the record reflects a variety of motions and requests made by Defendant's counsel that reflect a substantial understanding of the case. *See, e.g.*, Gov't Opp'n at 17-18 n.4 (explaining that Defendant's counsel was successful in obtaining, *inter alia*, "source documentation from the FBI for use in cross-examination of certain Government witnesses; information regarding [an] FBI informant . . . and authorization for the defendant to bring documents with him to court. In addition, the docket entries reflect numerous requests from counsel for investigative and expert witness assistance, which the Court granted.").[8]

---

[7] Although the Court will not entertain every vague and conclusory allegation contained in Defendant's Motion, the Court notes that Defendant repeatedly asserts that his counsel did not fully inform him of all facts and law relevant to the determination of whether to plead guilty or not guilty, and that his Counsel provided insufficient or incorrect advice to Defendant. *See, e.g.*, Def.'s Mot. at 10, 11, 14. These allegations are far too vague to provide sufficient grounds for relief, and fail to set out what facts, legal or otherwise, were withheld from Defendant. Notably, Defendant fails to cite to any support in the record for these vague allegations.

[8] Defendant asserts that his counsel provided ineffective assistance because she failed to inform him that he would not prevail at trial because the government had ample evidence with

Notwithstanding his counsel's efforts, Defendant did voice concerns to his counsel about her trial strategy, and Defendant's counsel asked the Court to put these concerns on the record at an ex parte hearing on May 24, 2000. *See* Gov't Opp'n Ex. D at 2033 (Transcript of Trial (D.D.C. May 24, 2000) ("Mr. Geraldo believes that I've been deficient and I'm going to state the areas. He can correct me and so on."). Notably, none of the concerns raised by Defendant in the instant Motion were identified by either counsel or Defendant at this hearing. Instead, Counsel informed the Court that Defendant was concerned about her decision not to call a particular witness to testify, her decision not to introduce a photograph into evidence which she could not locate and believed its existence was contradicted by an FBI surveillance log, and a few other matters none of which related to the arguments raised in the instant Motion. *Id.* at 2033-2055. After listening to the alleged deficiencies of counsel, the Court explained to Defendant that, "if I thought these were issues that showed some deficiency on your counsel's part, I would say so because I'm not interested in having this case go forward and if you get convicted having an issue at a later point about this. That's not in my interest and it's not fair to you and it's not useful for Ms. Asiner, either. She's making tactical decisions." *Id.* at 2055.

Defendant's last argument concerning a potential plea is that his counsel failed to advise him that "he could plead guilty without a[] . . . 'plea agreement' with the government. While the 'straight up' plea of guilty could have been rejected by the Court under certain limited

---

which to convict him, and did not inform Defendant that the statistics of the federal criminal trial conviction rates were severely against him. As to the first point, it was clear to the Court then and now that Defendant was aware of the evidence that the Government was going to present at trial, as well as the witnesses who would testify against him. *See* Tr. May 3, 2000 ("[s]o all I'm trying to do is set out what your options are. You know the case"), and Defendant offers no reason to believe that his counsel did not think she could be successful at trial. As to the second point, Defendant's identification of trial statistics is both irrelevant and speculative. Cases are resolved on a case-by-base basis – not by reference to some predetermined conviction rate.

circumstances, it was extremely unlikely that the Court would have done so in this case." Def.'s Mot. at 11-12. According to Defendant, such a plea would have resulted in three fewer sentencing points for acceptance of responsibility, U.S.S.G. § 3E1.1, a two-point sentencing reduction under the "Safety Valve," U.S.S.G. § 5C1.2 and U.S.S.G. § 2D1.1(b)(4)), and he "would also [have been] sentenced without any statutory mandatory minimum sentence."). Def.'s Mot. at 12. This argument is both speculative and meritless.

Initially, it is unclear whether Defendant is arguing that he would have entered a conditional plea or a nolo contendere plea. If he is arguing the former, Defendant would have needed the consent of both the Government and the Court. *See* Fed. R. Crim. P. 11(a)(2). Defendant is unable to identify *any* evidence in the record that the Government would have given its consent, and Defendant does not suggest otherwise in its Opposition. This argument also fails to make sense in the context of the record because Defendant is now suggesting that he would have plead guilty to all counts in the indictment, including one on which he was ultimately acquitted, notwithstanding the fact that he rejected the Government's plea offer that would have dismissed six of the eight charges against him. Nor would Defendant have had the benefit of a guaranteed application of the safety valve because the Government had taken the position that it did not apply, *see* Gov't Opp'n Ex. A at 1, and only agreed to its application for purposes of the plea agreement (which Defendant rejected). *See* Tr May 3, 2000 ("I don't know, if you went to trial, whether at the end I would still decide that the safety vale applies and, therefore, you would be out of the mandatory minimum; but if I did decide that it applied, was convinced by the government and maybe the presentence report writer, then what you're left with is 45 years of mandatory minimums, assuming I sentence you one right after the other").

If Defendant is arguing that he would have entered a nolo contendere plea, *see* Fed. R. Crim. P. 11(a)(3), his argument is fraught with additional difficulties. Under those circumstances, the Court would not have been inclined to grant Defendant a three-point reduction for acceptance of responsibility, as he was not admitting that he committed any conduct. *See Pollard*, 959 F.2d at 1031 ("'the judge's recollection of the events at issue may enable" her to rule on a Defendant's § 2255 arguments). Without the reduction for acceptance of responsibility, and without the guaranteed application of the safety valve as described above, Defendant would not have found himself in a more favorable position. Defendant also has the additional problem of not being able to identify any evidence in the record suggesting that he was *willing* to plead guilty. On the contrary, the record is replete with examples of Defendant's repeated assertions of innocence – even after his conviction. *See, e.g.*, Sent. Tr. at 4 ("defendant denies the criminal conduct, that's noted for the record"); *Id.* at 12 (addressing the Court at sentencing, Defendant stated the following: "I would just like to direct [sic] that I am just another victim of the police system in Washington, D.C. And in this case I am innocent . . ."). Rather than supporting Defendant's arguments, the record reflects Defendant's clear and consistent desire to proceed with a trial on his charges. *See United States v. Horne*, 987 F.2d 833, 836 (D.C. Cir. 1993) ("[i]t is clear that a defendant must make more than a bare allegation that he 'would have pleaded differently and gone to trial'") (quoting *Key v. United States*, 806 F.2d 133, 139 (7th Cir. 1986)).

In sum, the Court finds that Defendant's ineffective assistance of counsel arguments, as they relate to the plea phase of his proceedings, provide no basis on which to grant Defendant's Motion.

    2.    <u>Claims Related to "Pre-Trial Phase"</u>

Defendant's second set of arguments relate to his counsel's performance during the pre-trial phase. *See* Def.'s Mot. at 18. According to Defendant, his counsel's performance allegedly fell below the *Strickland* objective standard of reasonableness because she neglected to investigate, or failed to recommend to Defendant, that he proceed with a bench trial based on stipulated facts. This argument does not require extended discussion. In addition to suffering from the same infirmities described above,[9] a bench trial on stipulated facts would have required the Government's consent, which it indicates would not have been forthcoming. *See* Gov't Opp'n at 19 ("[t]here would have been no benefit to the Government in proceeding to a bench trial on stipulated facts against [Defendant], while proceeding to a jury trial" against his co-defendant). Equally problematic for Defendant is that he fails to identify the facts to which he would have stipulated, making this argument particularly speculative.

Even if Defendant could overcome the problems described above, the benefits that Defendant ascribes to a bench trial fail on the facts. Defendant claims that he could have retained his ability to challenge his "relevant conduct, criminal history, and . . . whether he was entitled to a downward departure or adjustments for mitigating factors," Def.'s Mot. at 18, although he fails to specifically identify what the basis for his challenge would have been. Nevertheless, addressing each of the areas he identifies in turn, all of the conduct relating to the drugs that formed the basis for Defendant's sentencing calculation was charged in the indictment. Because there was no other relevant conduct included in calculating Defendant's offense level according to the presentence report, there would have been nothing for Defendant to challenge.

---

[9] These infirmities include, among others, Defendant's failure to identify any evidence in the record suggesting that he was willing to plead guilty (especially in light of his repeated assertions of innocence and his rejection of the Government's plea offer).

*See* Sent. Tr. at 3-4. As for criminal history, Defendant was sentenced under criminal history category I, which is the lowest criminal history category. *Id.* at 15. As for a downward departure, the only one identified by Defendant for purposes of his sentencing is based on his "deportable alien" status. Contrary to Defendant's argument, the Court *granted* him this departure. *Id.* at 15 ("The court has indicated that it will do a downward departure based on the *Smith* case based on the fact that he is a deportable alien and therefore will not receive some of the benefits that somebody who is not a deportable alien would receive. I will depart one level which will place him in offense level 33 instead of 34, still a category 1"). Finally, as for mitigation, Defendant's counsel presented mitigation evidence at sentencing. *Id.* at 10-12 (discussing Defendant's age, characteristics, and the evidence presented at trial). Accordingly, Defendant's arguments concerning the benefit of a bench trial on stipulated facts are without merit.

    3.    <u>Claims Related to the "Sentencing Phase"</u>

Defendant's third set of arguments relate to his counsel's performance during the sentencing phase of the proceedings. Defendant argues that his counsel was deficient for two reasons. First, Defendant argues that his counsel did not object when he failed to receive a downward departure for his status as a "deportable alien." Def.'s Mot. at 19. As discussed above, the Court *did* grant Defendant a downward departure based on his "deportable alien" status. *See* Sent. Tr. at 15. Second, Defendant argues that this counsel failed to challenge Defendant's convictions "on the substantive counts as impermissibly tainted by the instruction pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946)." This argument lacks merit because the Court did not issue a *Pinkerton* instruction. The question in *Pinkerton* was whether one of

17

two co-defendants could be convicted of substantive offenses associated with a related conspiracy charge if there was enough evidence to convict the other co-defendant of the substantive offenses. *Pinkerton*, 328 U.S. at 642. Here, the Court specifically instructed the jury to consider each charge separately:

> I'm going to tell you about the charge of conspiracy to distribute and possession with intent to distribute cocaine base, which is a separate charge from the counts in the indictment charging distribution of cocaine base and separately possession with the intent to distribute cocaine base with which each defendant also is charged. So you have a conspiracy to distribute and possession with the intent to distribute cocaine base, and then we have separate charges that are different that are the distribution and possession with intent to distribute, so I want you to understand that, and I'll read the instructions relating to those.

Tr. May 25, 2000 at 2224. *See also Id.* at 2239 ("consider each instruction . . . separately and individually to each defendant on trial").

Defendant has failed to advance any meritorious ineffective assistance of counsel argument. Because a challenge of ineffective counsel must clear both hurdles of the *Strickland v. Washington* test, the Court may cease inquiry after the motion has failed step one, evidence of deficient performance. *Strickland*, 466 U.S. at 687. Defendant has provided none of the necessary "detailed and specific" allegations required to invoke an evidentiary hearing under Section 2255. *Machibroda*, 368 U.S. at 495, 82 S. Ct. 510.

B.   *Apprendi and Booker Claims*

Defendant makes two related claims in his "Traverse." First, argues that he was denied Due Process of law under the Fifth Amendment and "rights to notice and jury trial" under the Sixth Amendment because his sentence reflects an increase "by facts not charged in indictment, not submitted to a jury, and not proven beyond a reasonable doubt or admitted by Mr. Geraldo."

Def.'s Traverse at 2. This claim, often referred to as an *Apprendi* claim based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Here, Defendant has failed to state an *Apprendi* claim because all of the conduct relating to the drugs that formed the basis for Defendant's sentencing calculation was charged in the indictment and his sentence does not exceed the statutory maximum for conviction of those counts.

Defendant's second argument is that his sentence is improper because the Supreme Court made the Federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), a case that was decided approximately five years after Defendant received his sentence. The D.C. Circuit has held that *Booker* may not be applied retroactively. *See In Re Fashina*, 486 F.3d 1300, 1306 (D.C. Cir. 2007 ("We . . . conclude, as have all our sister circuits, *Booker* does not meet the criteria for retroactive application."). Accordingly, this claim must also fail.

## CONCLUSION

For the reasons set forth above, the Court shall DENY Defendant's [228] Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.

Date:   December 6, 2007

                                                      /s/
                                            COLLEEN KOLLAR-KOTELLY
                                            United States District Judge